| ¡.PARRO, J.
In this workers’ compensation case, Gaylord Container Corporation (Gaylord) and its insurer, Continental Casualty Company (CCC), appeal a judgment in favor of Gaylord’s former employee, Sylvia J. Smith, who injured her left knee at work. The judgment ordered Gaylord and CCC to pay for continuing treatment by Ms. Smith’s orthopedist and to reinstate temporary total disability benefits from their date of termination until Ms. Smith is released by her orthopedist. The judgment also imposed $7500 in penalties and $5000 *611 in attorney fees against the defendants. For the following reasons, we affirm in part, reverse and render in part, and remand.
BACKGROUND
Ms. Smith had been working for Gaylord for about six years when she injured her left knee at work stepping off a forklift truck on February 24, 1996. After an extended period of physical therapy, an orthopedist performed arthroscopy on her knee on February 13, 1997. Additional physical therapy did not completely resolve the problem, so on September 8, 1997, Ms. Smith underwent posterior cruciate ligament reconstruction surgery. By May 1998, an orthopedist determined in an independent medical examination that Ms. Smith could return to work with some limitations, and her benefits were discontinued. She filed a disputed claim for compensation in August 1998. After a hearing in April 1999, the workers’ compensation judge ordered Gaylord and CCC to reinstate her temporary total disability benefits, retroactive to the date when they were discontinued, and to continue those benefits until she was released from her orthopedist’s care. The judgment also imposed penalties and attorney fees.
In this appeal, Gaylord and CCC contend the trial court erred in reinstating temporary total disability benefits, because Ms. Smith admitted at trial that she could handle a cashier’s position. They also claim she is not entitled to supplemental earnings benefits, because she held a light-duty job with Gaylord making her same wages, from which she was terminated due to absenteeism. With reference to the penalties and attorney fees, Gaylord and CCC argue they had good reason to terminate Ms. Smith’s ^benefits and were not arbitrary and capricious. They further claim the trial court erred in imposing a penalty greater than the statutory maximum.
STANDARD OF REVIEW
Factual findings in a workers’ compensation case, such as whether a claimant is entitled to temporary total disability benefits, are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551, 556. Under this two-part test, the appellate court must determine from the record whether there is a reasonable factual basis for the finding and whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and render judgment applying the correct law. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735; Oubre v. Jacobs Engineering Group, 98-1129 (La.App. 1st Cir.5/14/99), 739 So.2d 235, 237.
TEMPORARY TOTAL DISABILITY BENEFITS AWARD
The workers’ compensation court awarded Ms. Smith retroactive reinstatement of temporary total disability benefits and continued payment of those benefits until her orthopedist releases her from treatment. Under this judgment, Ms. Smith’s indemnity benefits, which began in February 1996, and were discontinued about May 1998, would be reinstated and paid for some indefinite period.
At the time of Ms. Smith’s injury, Louisiana Revised Statute 23:1221(l)(d) provided:[2]
*612 An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee’s physical condition has | ¿improved to the point that continued, regular treatment by a physician is not required, or six months after the injury, whichever first occurs. If the claimant contends that his disabil-. ity is of a temporary nature, but extends beyond this six-month period, he must submit a claim for extension of the period of temporary total disability under R.S. 23:1310.3. (emphasis added).
The clear and unambiguous terms of this statute provide that the initial award of benefits is limited to the period of six months after the date of the injury or until the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee’s physical condition has reached maximum medical improvement, whichever occurs first. Hughes v. Carroll Timber Co., 96-0031 (La App. 1st Cir. 10/1/96), 694 So.2d 331, 335. Therefore, the initial award will be for, at most, six months after the date of injury. Hughes, 694 So.2d at 335. If the employee contends that her disability is of a temporary nature, but extends beyond this six-month period, she must submit a claim for extension of the period of temporary total disability under Louisiana Revised Statute 23:1310.3. LSA-R.S. 23:1221(1)(d); Parfait v. Gulf Island Fabrication, Inc., 97-2104 (La.App. 1st Cir.1/6/99), 733 So.2d 11, 19.
In this case, Ms. Smith was injured in 1996 and temporary total disability benefits were paid until mid-1998. The record does not indicate that Ms. Smith filed for an extension of the period of temporary total disability, as required by the applicable statute. Therefore, the initial award of temporary total disability benefits should have ceased after a period of six months from the date of the injury. The trial court erred in holding that Ms. Smith was entitled to additional temporary total disability benefits. Because this is an error of law, this court must review the record de novo to determine whether Ms. Smith is entitled to any benefits under the law.
EVIDENCE
Ms. Smith testified at trial. Anita Kocke, the medical case manager who handled Ms. Smith’s claim for CCC from mid-1997, also testified. Ms. Smith’s medical records, physicians’ reports, CCC’s file activities report, and a job function evaluation form were introduced and admitted into evidence. An investigator hired by CCC, Tracey Knight, |Balso testified. In connection with his'testimony, a video tape of Ms. Smith was admitted into evidence.
Ms. Smith testified that she was a high school graduate. Before working for Gay-lord, she had worked as a waitress, as a cashier at a small gas station convenience store, and as a cashier and stock clerk. All of these jobs paid minimum wage or less. At the time of her accident, she was working forty hours each week, plus frequent overtime, making $11.96 per hour as a bander operator for Gaylord. In that position, she worked at a banding machine, running stacks of flattened corrugated cardboard boxes along a conveyor belt and operating the mechanism that banded them with plastic straps. She had to step up and down on the conveyors for each load and banded between 20 to 30 loads per hour. When the banding machine malfunctioned, she had to climb on top of it — about three feet off the ground — to remove the gears and repair the motors. She also worked on another machine that wrapped loads with plastic wrap. For this duty, she would use a forklift to pick up a load and take it to the wrapping machine; then climb off the forklift, tuck in the plastic wrap, start the machine to wrap the plastic around the load, and cut the plastic wrap when it was finished; then climb back onto the forklift, remove the load, and *613 put it in its proper place. Other times she moved scrap loads, which also required her to climb in and out of a forklift to move the loads around.
On February 24, 1996, she was working at the plastic wrapping machine. While climbing down from the forklift, Ms. Smith twisted her left knee and felt it pop. She reported the incident immediately to her Gaylord supervisor and completed an accident report. Several days later, because of continuing problems with her knee at work, Gaylord sent her to Dr. Jei Jei Feinberg. As a result of this visit, she was placed on light duty. This work involved walking around the plant, washing windows and tables. However, her knee continued to “go out,” causing her to fall, so on March 1, Dr. Feinberg took her off all work duty. Ms. Smith testified that after being taken off all work duty by Dr. Feinberg, she never went back to work. Dr. Feinberg also advised 16that she should see an orthopedist. At this point, Gaylord and CCC began paying Ms. Smith temporary total disability benefits.
She saw an orthopedist of her choice, Dr. Timothy Finney, on March 22. The medical records show Dr. Finney found clinical evidence of a posterior cruciate ligament tear and possible medial meniscal tear. An MRI of her knee showed a tear of the lateral meniscus. Dr. Finney indicated he would try to treat the condition with physical therapy, but noted Ms. Smith might need arthroscopy if physical therapy did not correct the problem. In an April 80 report to Gaylord and CCC, Dr. Finney stated she could perform light duty with limitations of no standing, walking, heavy lifting, squatting, kneeling, or bending. However, Ms. Smith testified Dr. Finney never told her she could .go back to work, so she did not return to work. She had several months of physical therapy, during which time Dr. Finney’s notes reflected she could not return to her regular work activities.
The record is inconclusive concerning Ms. Smith’s post-accident employment with Gaylord. Ms. Smith’s only discussion of light-duty work concerned her initial attempt that ended in March 1996. However, she admitted on cross-examination that Gaylord terminated her in May 1996 for absenteeism due to her children’s health or her health, but unrelated to her knee injury. Perhaps she was offered additional light-duty work after March 1996, but did not go in to work. However, this is only conjecture; the record contains no other information concerning her May 1996 termination. The only post-accident work or work opportunity established in this record is the one week of light-duty work immediately after her accident, before Dr. Feinberg took her off all work duty in March. Based.on Dr. Feinberg’s April 30 report, Ms. Smith could not return to the same type of work she did during that initial period of “light-duty” employment, which involved considerable walking. There is no evidence in the record that some other, less strenuous duty was ever offered to her. And after the May termination, employment of any kind at Gaylord was apparently no longer available to her.
|7By July 1996, it was apparent the physical therapy was not remedying her condition, and Ms. Smith and CCC agreed she should see a different orthopedist. On August 29, 1996, CCC sent her to its choice of physician, Dr. Charles P. Murphy. After examining her, Dr. Murphy advised that she was totally disabled due to her knee injury and complaints of back and hip pain. He recommended arthrosco-py, but wanted an MRI of her lumbar spine to rule out spinal injury before performing this procedure. CCC reinstated benefits,[3] but refused to authorize the *614 MRI, maintaining any back problems were unrelated to the accident. During October and November, Dr. Murphy’s notes indicated Ms. Smith could perform light-duty work. In December, he stated this was an error, and she was still totally disabled. Dr. Murphy also advised that if the ar-throscopy did not resolve Ms. Smith’s knee problems, she may need additional surgery to reconstruct the posterior cruciate ligament. Such reconstruction could not be accomplished with arthroscopy. Although CCC’s file activity reports from January 29, 1997, reflected some consideration was given to vocational rehabilitation at that time, none was ever initiated.
On February 13, 1997, Dr. Murphy performed the arthroscopy. During this procedure, he removed loose cartilage that had sheared off from the undersurface of the patella, shaved some of the lateral meniscus where it was frayed and impinging into the posterior medial compartment, and shaved the undersurface of the patella. Dr. Murphy saw a partial tear of the posterior cruciate ligament. Following the arthroscopy, Ms. Smith had several more months of physical therapy. During a follow-up visit with Dr. Murphy in May 1997, he noted that the posterior cruciate instability was not responding to physical therapy and that her rehabilitation was made difficult due to back pain. He again strongly recommended a lumbar MRI, which CCC again refused to |Rauthorize. Dr. Murphy also said Ms. Smith continued to be disabled from her previous work, but could perform light-duty office work, if it were predominantly sedentary and involved no lifting greater than 10 pounds. He also scheduled her for an evaluation by Dr. Carlos Guanche to determine whether she needed surgery to reconstruct the posterior cruciate ligament.
Dr. Guanche examined her on June 30, 1997, and recommended the additional surgery. In July 1997, Ms. Smith finally obtained a lumbar MRI at Charity Hospital in New Orleans. Eventually, the results of this test were received, and because the MRI was normal, the posterior cruciate ligament reconstruction was scheduled with Dr. Guanche for September 8, 1997. During this surgery, a graft from the Achilles tendon was inserted to repair the ligament and was fixed in place with a bioscrew. Dr. Guanche prescribed another course of physical therapy for Ms. Smith, and noted in December 1997 that she was tolerating the physical therapy well and had been advancing nicely with strength increases. The physical therapy was to be continued, with another followup visit in three months.
At that point, there was apparently some miscommunication between Dr. Guanche and CCC. The file activity report indicated on February 17, 1998, that Dr. Guanche had told the medical case manager that Ms. Smith was at maximum medical improvement and could return to work doing her pre-injury job. Ms. Kocke said Dr. Guanche had reviewed the job function evaluation describing Ms. Smith’s job at Gaylord, and released her to that job with no lifting greater than 20 pounds and no repetitive squatting. Apparently as a result of this conversation, benefits were discontinued sometime in early March.
However, at Ms. Smith’s March 2, 1998 visit, Dr. Guanche’s notes reflected the following:
The patient is now six months status post posterior cruciate ligament reconstruction of the left knee. She is still significantly hampered with respect to activity in her leg. She has difficulty with stairs, has not even attempted stair descensión (sic) yet.
*615 ]90n physical examination, she has a trade posterior shift. She has pain over the anterior patellar tendon, as well as pain with patellar-femoral compression.
Dr. Guanche prescribed an additional six weeks of rehabilitation. His notes further indicated that after six weeks he would consider Ms. Smith for re-evaluation with perhaps a new job placement not involving significant lifting or up and down movement. In a March 28, 1998 letter, Dr. Guanche stated, “I believe that there is a little miscommunication” concerning Ms. Smith’s condition. He recommended a continued course of physical therapy, because her knee was inadequately rehabilitated and she still suffered from significant weakness. He further stated her pre-inju-ry job, as described to him by Ms. Smith, was a very heavy duty job requiring significant lifting, bending, and other activities she was unlikely to be able to do. Dr. Guanche advised retraining or positioning Ms. Smith in a job which would not require such activities. He concluded that “prior to clearing her for any job, she should go through this course of physical therapy and at that point, we will reassess her and decide what she can and cannot do.” He prescribed a different type of physical therapy to alleviate some of the stresses and pain she was experiencing with the previous exercises. At this point, CCC refused to authorize an April follow-up visit to Dr. Guanche or physical therapy, deciding instead to get a second opinion.
On April 17, 1998, CCC sent Ms. Smith to another orthopedist, Dr. Edmund C. Landry, Jr., for an independent medical examination. Dr. Landry’s report of this visit stated:
I believe that this patient has residual atrophy of the thigh musculature.... She would probably be best managed at this point by restrictions from activities that would over stress the quadriceps muscle and patellar tendon. This would include mainly lifting heavy weights from a squatted position and repetitive stair or ladder climbing.
[[Image here]]
[T]he patient’s work related injury diagnosis is posterior cruciate ligament tear. Patellar tendonitis is a frequent complication of that type of injury and also the rehabilitation of cruciate reconstruction surgery. At the present time I believe that she should remain under the care of her orthopaedic surgeon. She may benefit from anti-inflammatory medications and the above noted continued exercise program for strengthening of the leg. Formal physical therapy is probably no longer necessary since it has not made a significant difference in the last several ■ | mmonths. She can return to work with the above noted restrictions. She may have permanent residual impairment of the knee due to thigh atrophy and patel-lofemoral pain if she is unable to further rehabilitate the knee. I think that if she were engaging in a regular exercise program for strengthening of the leg and did not make significant improvement after six or eight weeks then she would have reached her maximum medical improvement at that point.
On the basis of Dr. Landry’s recommendation, CCC approved another visit with Dr. Guanche and authorized the additional physical therapy he had prescribed.
However, Tracey Knight, an investigator hired by CCC, had conducted surveillance on Ms. Smith when she went for her appointment with Dr. Landry. He videotaped her changing her tire in the parking garage of Dr. Landry’s New Orleans office. Because that video tape showed Ms. Smith lifting the tire, bending, and squatting, CCC concluded Ms. Smith could do more than she was telling her physicians. Although Dr. Landry’s report did recommend continued follow-up with her orthopedist, he also noted that it appeared in the video tape that Ms. Smith had full range of motion of the back and full ability to squat and do a deep knee bend. .
*616 In a letter to Dr. Murphy on May 12, 1998, because Dr. Guanche was leaving the area, he referred Ms. Smith back to Dr. Murphy for further care. He stated:
At this point with regard to the management of her orthopedic injuries I feel that she is at what would be a maximal improvement since she has not really progressed in the last few months. She has gotten one more prescription from me on 5/11/98 for physical therapy. Following that I do not feel that any more formal physical therapy would be indicated since I do not see any benefit in it.
In this letter, Dr. Guanche also informed Dr. Murphy that the surveillance of Ms. Smith suggested she did not have any significant ambulatory incapacity and apparently had no problem lifting a tire to' change a flat.
■ Instead of authorizing Ms. Smith to return to Dr. Murphy, CCC scheduled another appointment with Dr. Landry. The file activity report on May 21, 1998, states that CCC wanted Dr. ■ Landry to release Ms. Smith to work at her full pre-injury job, because the restrictions he had described after her first visit had nothing to do with her job. This|nnote also indicated benefits would not be reinstated.[4] Her attorney advised CCC that Ms. Smith would not keep the appointment with Dr. Landry, because her condition was unchanged since her previous visit. On June 19, the file activity report reflects CCC sent a letter to Dr. Murphy’s office directing them to get authorization from CCC if Ms. Smith contacted them for another appointment. Ms. Smith testified that she did try to get an appointment with Dr. Murphy, but was told by someone that CCC would not authorize it.[5]
Ms. Smith stated she had received no additional medical treatment for her knee. Although she could squat, she did so by extending the left leg out and putting all her weight on the right leg. She had not sought any work since her accident at Gaylord.
SUPPLEMENTAL EARNINGS BENEFITS
The purpose of supplemental earnings benefits is to compensate the injured employee for the wage-earning capacity lost as a result of the accident. Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52, 55 (La.1993). An employee is entitled to receive supplemental earnings benefits if she sustains a work-related injury that results in her inability to earn ninety percent (90%) or more of her average pre-injury wage. LSA-R.S. 23:1221(3)(a). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in her inability to earn that amount under the facts and circumstances of the individual case. Freeman v. Poulan/Weed Eater, 93-1530 (La.1/14/94), 630 So.2d 733, 739. This analysis is necessarily a facts and circumstances one, in which the court is mindful of the jurisprudential tenet that workers’ compensation is to be liberally construed in favor of coverage. Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989).
Once the employee’s burden is met, the burden shifts to the employer who, in order to defeat the employee’s claim for supplemental earnings benefits or to establish |1?.the employee’s earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in her or the employer’s community or reasonable geographic region. LSA-R.S. 23:1221(3)(c)(i); Daigle, 545 So.2d at 1009. *617 The amount of supplemental earnings benefits is based on the difference between the claimant’s pre-injury average monthly wage and the claimant’s proven post-injury monthly earning capacity. LSA-R.S. 23:1221(3)(a).
Based on the evidence in the record before us, we conclude Ms. Smith has carried her burden of proving, by a preponderance of the evidence, that she is unable to earn 90% of her pre-injury wage. The physicians who examined her following her posterior cruciate ligament reconstruction were unanimous in recommending work that would not require frequent climbing, bending, squatting, or lifting. Her job as a banding operator with Gay-lord clearly required her to perform all of these activities on a fairly regular basis. Her work history indicates that, other than her job at Gaylord, she has never held a job paying more than minimum wage, which is considerably less than 90% of her pre-injury wage. At the present time, given her training and education, combined with her physical limitations, it is more probable than not that her earning capacity is minimum wage employment.
Gaylord contends that, because she was offered light-duty employment and was terminated for reasons unrelated to her injury, the evidence reflects she can earn her pre-injury wage. However, the only period of actual or offered employment with Gaylord that is established in this record is the one week following her injury when she tried to do light-duty work. This brief attempt occurred long before her two surgical procedures and does not prove that her current condition would allow her to return to the same or similar duties with Gaylord.[6] Further, although Gaylord claims, and she admits, she was terminated in May due to absenteeism, the only inference that can be drawn, from this fact is that Gaylord was no longer willing to offer her any employment.
| -^Having shown she could not earn 90% of her pre-injury wage, the burden shifted to Gaylord to establish that Ms. Smith was physically able to perform a certain job and that such a job within her limitations was offered to her or was available to her in her or Gaylord’s community or reasonable geographic region. Gaylord has not established this. We conclude, therefore, that Ms; Smith is entitled to supplemental earnings benefits computed on the difference between her pre-injury average monthly wages with Gaylord and minimum wage.
Average monthly wages aré computed as 4.3 times the wages as defined in Louisiana Revised Statute 23:1021(10). LSA-R.S. 23:1221(3)(a). That provision defines “wages” as the average weekly wage at the time of the accident. LSA-R.S. 23:1021(10). If the employee is paid on an hourly basis and is employed for forty hours or more, the average weekly wage is determined by multiplying the employee’s hourly wage rate by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater. LSA-R.S. 23:1021(10)(a)(i). Overtime can be included in the calculation of the average weekly wage if it was included in the actual hours worked four weeks before the injury, but the record must contain evidence of the overtime. Deshautelles v. South Central Bell Tel. Co., 96-0716 (La.App. 1st Cir.12/20/96), 694 So.2d 381, 384.
The record in this case does not contain any evidence of the hours Ms. Smith actually worked in the four full weeks preceding the date of her accident. Therefore, the information is insufficient for this court to make the necessary computation, and the matter will be remanded for the admission of such evidence and the calculation of the supplemental earnings benefits.
*618 MEDICAL BENEFITS
According to Drs. Guanche and Landry, Ms. Smith was at or near maximum medical improvement in May 1998. Over two years has elapsed since that date, so it is unlikely that Ms. Smith’s condition will be improved by additional medical treatment. However, this court has no evidence concerning Ms. Smith’s knee condition since the h ¿trial, when she testified she still had serious limitations. It is possible her condition has worsened since then. Therefore, we agree with the trial court that Ms. Smith should return to her orthopedist at Gaylord’s and CCC’s expense and obtain any necessary medical treatment until she is released from his care.
The trial court did not assess Ms. Smith’s need for vocational rehabilitation, but stated in oral reasons that if her orthopedist felt she could not return to the position she occupied at Gaylord when she was injured, then vocational rehabilitation should be instituted. We agree. See LSA-R.S. 23:1226(A); Page v. Page, 98-1625 (La.App. 1st Cir.9/24/99), 762 So.2d 18, 21. It is in Gaylord’s interest to provide such rehabilitation or retraining to Ms. Smith if appropriate, because if other employment can be found commensurate with her abilities and within her physical limitations, but earning more than minimum wage, Gaylord’s obligation to provide supplemental earnings benefits may be reduced or eliminated. Any such rehabilitation should comply with the requirements of applicable statutes and jurisprudence. See Page, 762 So.2d at 21-22.
PENALTIES AND ATTORNEY FEES
The applicable statutory authority for assessing an insurer with penalties and attorney fees depends on whether the insurer did not commence the payment of benefits in a timely fashion or discontinued benefits that had been timely paid. See LSA-R.S. 23:1201(F) (failure to commence or pay benefits timely) and LSA-R.S. 23:1201.2 (discontinuance of benefits). In Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99), 737 So.2d 41, the supreme court made it clear that Section 1201.2, as amended in 1995, applies when an insurer or employer discontinues payment of benefits. It states, in pertinent part:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims.
Under these provisions, the only possible “punishment” for arbitrary or capricious behavior is an award of attorney fees. Penalties are recoverable only under Section lir, 1201(F) when there has been a failure to commence or pay benefits timely.[7] See Brown v. Texas-La Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885.
In this case, the facts do not suggest there was untimely commencement or payment of benefits; rather CCC discontinued benefits after paying them for an extended period. Therefore, the award of penalties was not authorized by law, and must be reversed.
This court must then consider whether the trial court’s award of attorney fees was proper under the applicable statute. An employer or insurer must make reasonable efforts to ascertain the employee’s exact condition before terminating *619 benefits. Termination of benefits may be considered arbitrary when it appears that further information was required to make an exact determination of the employee’s condition. See Porter v. Gaylord Chem. Corp., 98-0222 (La.App. 1st Cir.9/25/98), 721 So.2d 27, 32, writ denied, 98-2712 (La.12/18/98), 734 So.2d 638. Whether the imposition of attorney fees is warranted is a factual question which will not be disturbed on appeal in the absence of manifest error. Porter, 721 So.2d at 32-33.
Under the facts of this case, we find no manifest error in the trial court’s award of attorney fees. The last two physicians who examined Ms. Smith, Drs. Guanche and Landry, advised that she' ' should remain under the care of her orthopedist, at least until one more period of physical therapy had been completed. At that point, her medical condition could be re-evaluated and some decision made considering her long-term prognosis and whether she had reached maximum medical improvement. While it is understandable that CCC and Gaylord were getting impatient at this point with the slow pace of Ms. Smith’s recovery, it is also clear that in May 1998, further information was required to determine her exact condition. Therefore, the trial court did not err in [^ordering CCC to pay attorney fees to Ms. Smith. We do not find the award of $5,000 is unreasonable.
CONCLUSION
The judgment of the'trial court awarding temporary total disability benefits is reversed, as is the award of $7,500 in penalties. Gaylord and CCC are ordered to pay Ms. Smith supplemental earnings benefits, and the case is remanded to the trial court for evidence upon which such an award can be computed and for calculation of the appropriate amount. In all other respects, the judgment is affirmed. Each party is to bear its own costs of this appeal.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REMANDED.

. We must apply the statutes as they existed at the date of the employee’s injury. See McCoy v. KMB Transport, Inc., 98-1018 (La.App. 1st Cir.5/14/99), 734 So.2d 886, 889, writ denied, 99-2295 (La.11/24/99), 750 So.2d 986. Therefore, all references to provisions of the workers' compensation statutes will be to the law in effect in February 1996.

. According to CCC’s file activity reports and Anita Kocke's testimony, Ms. Smith's benefits were discontinued at various times for various reasons, but were always reinstated. For instance, a CCC case worker learned on May 6 that Ms. Smith may have injured her knee in an automobile accident in April, so a notation in the file activity report states benefits *614 were discontinued. Several days later, those reports show the April automobile accident had not injured Ms. Smith’s knee, so benefits were to be reinstated. On July 29, benefits were again discontinued on the basis that the insured worker returned to work on light duly. However, Ms. Smith said she never went back to work after March 1996. So it is unclear whether this notation once again refers back to the initial week of light-duty work.

. It is not clear from the record exactly when those benefits had been discontinued.

. Ms. Smith could not recall exactly who gave her this information, whether it was someone at Dr. Murphy’s office or CCC’s medical case manager, Ms. Kocke. Ms. Kocke said she had no recollection of speaking with Ms. Smith about returning to Dr. Murphy.

. We note also that there is no testimony or documentary evidence establishing her wage rate during this period of light-duty work for Gaylord after her injury.

. Louisiana Revised Statute 23:1201(F) states, in pertinent part:
Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim.